The second case for argument is Ricky Hughes v. Wisconsin Central, Ltd., et al. When you're ready, Mr. Gunsberg. Thank you. May it please the Court, counsel. My client, Mr. Hughes, is also in the courtroom. The record does not suggest that plaintiffs acted with any intent to defraud creditors or to intentionally mislead or manipulate the judicial system. These are not my words. These are the words of the district court. This was the finding of the district court based on its review of the entire record in this case. After reviewing all of the evidence presented by the defendants, the district court found that there was nothing that even suggested that Mr. Hughes acted with any intent to defraud his creditors or to mislead or manipulate the courts. Based on this finding, the district court initially declined to apply the doctrine of judicial estoppel and denied defendants' motions for summary judgment. That was the correct ruling. Why? Because it was on all fours with the doctrine of judicial estoppel. In Ryan Operations GP, the court held that judicial estoppel was never meant to be used as a technical defense for litigants to derail potentially meritorious claims, particularly where an inconsistent position is a result of a good-faith mistake. Rather, the doctrine should only be applied where there is evidence of intent to manipulate or mislead the courts, i.e., to play fast and loose with the courts. And that's why the district court properly denied defendants' motions for summary judgment on October 29, 2021. There was simply no evidence that Rick Hughes intended to defraud his creditors or to mislead or manipulate the court. How do we — why does that matter, though, if you don't list it on the schedules? And there's — I don't know that there's any — there's no real dispute that he probably knew he had the cause of action because he was injured before then. So I'm trying to figure out why the intent to mislead the court matters under the plain language of the statutes. Well, I don't believe that there is a showing that he knew of his cause of action. I knew — he knew that he was injured, and he knew that — and he went to somebody in the risk management department, Steve Moeller, at the railroad, and told him that he had been injured on the job and was there strictly to get his medical bills paid for. That was the reason he was there. They had him fill out a form that I submit was ambiguous. He filled out the form, said that he had a claim. It's not clear whether they were — whether he was saying that he had filed a lawsuit or he intended to file a lawsuit or that he had a claim or intended to file a claim. He — I believe the evidence indicates that he was wanting to get his medical benefits paid for, and he was not aware of any cause of action that he had. In fact, he didn't even consult an attorney until roughly a year and three quarters after — you know, more than a year and a half after he was discharged in bankruptcy. It was only then that he became aware that he had a FILA claim, and it was even after that, months after that, that his attorneys realized that there was also a cause of action for product — strict product liability. Is there anything, though, in the statute — I guess you are disputing that, so we get to the next question, which is, is there anything in the statutory scheme that shows intent to hide makes a difference? I read it as if the claim exists, even if — you know, even if you potentially haven't vindicated it yet, that you still have to list it on the — potentially list it on the schedules as a potential claim. I mean, I'm no bankruptcy expert, but that's my sense. And I'm not either. But I agree that if Mr. Hughes became aware that he had a claim, knew that he had a claim, then, yes, it needed to be listed. I'm suggesting to you that based on the evidence and based on the finding of the district court, there was no evidence that he was aware of his claim. The district court had — when it made its ruling on October 29, 2021, denying defendants' motion for summary judgment and specifically stating that there was no evidence of any intent to defraud creditors or to mislead or manipulate the courts, the district court had a copy of that application for sickness benefits. It was part of the record. And yet the court still ruled that there was no evidence of intent to defraud creditors or to manipulate the court. So, you know, I don't believe that — I don't believe that Mr. Hughes was aware of his claims at the time he filled out that form. If he had been, yes, it would have been required — it was required that they be disclosed. Let me ask you this. I want to make sure I understand how FELA works. If — we have these two applications for sick benefits, sickness benefits. If a person is injured on the job, and in this case he's working for the Canadian railroad company, do they have to file a lawsuit to get paid sick benefits for their work-related injury? Not if the company voluntarily pays his benefits. Well, but I mean, let's say — is that the problem here? They wouldn't pay it? Is that why he had to file this application? No, Your Honor. I think that his benefits were being paid. But I think he had to — Well, what was the purpose? I guess I'm — maybe I'm not being very articulate. What was the purpose of the application? Well, my understanding is, and I don't know the internal workings of Wisconsin Central or Canadian National, but my understanding is, is that when you're injured on the job, and if you want to get certain medical benefits, sickness benefits, you have to go in and you have to fill out an application for that. That's not the same as filing a FELA claim. And there is nothing in the application that even discussed FELA. So — and I was kind of struggling with this a little bit when I was looking at the documents, too, mainly because FELA is sort of outside my ordinary scope of practice, both as a lawyer and as a trial judge. I mean, I think I have a couple FELA cases in my lifetime. But when I looked at them, I said, is this — the sickness claim, is that like a MedPay claim that might be made to a workers' compensation carrier? And what you make is a claim for just the medical pay and perhaps some time off to recuperate, as opposed to a claim that seeks compensation for the extent and nature and permanent nature of the injuries? Well, my understanding is — and again, my only — every company is different, and I don't know what other railroads do with regard to injuries on the job. My understanding is that he was strictly seeking, by filling out this application, he understood that he was strictly seeking to get his medical bills paid. If he wanted to file a FELA claim, that's something entirely different. And you may recall that the defense had filed an affidavit from a Mr. Steve Moeller, who was the risk manager who had discussions with Mr. Hughes at the time that he filled out the application for sickness benefits. There was no — Mr. Moeller never stated that he discussed filing a — never discussed with Mr. Hughes that he had the right to file a FELA claim or anything involving FELA at all. So my understanding is, based on the evidence, and the evidence that was before the district court, he filled out this application for sickness benefits because he wanted to get his medical bills paid. And that was it. So I don't know if I've answered your question, or your question, Your Honor. So what changed after the district court having denied defendants motions for summary judgment on October 29, 2021? What changed between then and February 2, 2023, when the district court reversed course and granted defendants motion for summary judgment? I submit that essentially nothing changed during that time. There was no new evidence that was presented to the district court from which the district court could now infer that there was some intent to defraud creditors or manipulate the judicial system. There was no new evidence. The only new evidence that the court was presented with was the ruling of the bankruptcy court that found that, while it could not approve the settlement between Mr. Hughes and the trustee, because more than five years had elapsed since the first payout under the plan, the court nevertheless determined that there was no harm to the creditors by the failure to disclose the claims during the bankruptcy proceedings because the creditors never could have collected any money in this case, because any money would have been paid out more than five years after the first payout under the plan. Is that true, though? Well, the trustee could have sought a quick settlement, could have realized that there was a claim here, could have sought a quick settlement, could have then distributed that money to the creditors. Of course, now we're leaving aside the fact that the claim that your client didn't know it, and then possibly the trustee wouldn't know it either, but at least disclosing it could have led to some more money for the creditors. That possibility exists, except for the fact that Mr. Hughes never consulted an attorney until, you know, more than a year and a half after the discharge. So who was going to be pursuing this claim on behalf of the creditors? No, I get that, but I guess the point is we have to think about not only this case, but we have to think about the next case, too. And what I worry about is people holding on to their claims, never consulting an attorney, and then the day after bankruptcy, two days after bankruptcy, a year after bankruptcy, going to a lawyer and saying, oh, I've got this great claim. Yeah, you've got this great claim worth a billion dollars, and the creditors are left out. That's the whole purpose of listing the assets on the schedules. And I agree, and I agree with that, but in this instance, I don't think that there's any evidence of chicanery or that he intended to — that he knew about his claim and that he intended to hold back so he could file it later. No plaintiff in his right mind, I submit, would wait until a few days before the expiration of a statute of limitations to file a claim. I don't think he didn't know about it, you know, in the just happenstance that, you know, he did consult an attorney in time. Your Honor, unless there's any other questions, I wanted to reserve my remaining time for questions. I do have one question. Judge Frank, to some extent, certainly relied upon Judge Fisher's bankruptcy court order. Do we take that as the law of the case, whatever the bankruptcy judge said about this particular situation? I believe so, Your Honor. I believe so. I think that Judge Frank specifically stated that and denied the motion for summary judgment initially without prejudice because he wanted the bankruptcy court was better prepared to address. And at least one of the parties here was a participant in the bankruptcy proceeding, right, Portico? The bankruptcy — yes, Portico was a participant until Portico — the court ruled that Portico lacked standing to raise any objection. With regard — just quickly with regard to standing, I submit that the law of the case is what Judge Fisher stated. He stated that the lawsuit vested in the debtor upon discharge, which was December of 2018. Your Honor, I've only got about 30 seconds left, so if I can reserve that for rebuttal. You may. Mr. Geller, when you're ready. Thank you, Your Honor. I'm Les Gellhart representing the Wisconsin Central. May it please the Court, counsel for appellant and counsel for co-defendant to have police. I think it's clear from the record that the first three — the New Hampshire factors, the first three New Hampshire factors are established. The inconsistent positions, the acceptance of those positions in the first proceedings, and the fact that that acceptance benefited Mr. Hughes potentially to the detriment of others, certainly to the detriment of his creditors. What the judicial estoppel part of this case is all about, really, is this notion of inadvertence or chicanery or malintent. You said it's obvious it's to the detriment of his creditors, but Judge Fischer said no, it wasn't to the detriment of his creditors. And that's why I'm concerned about what is the effect of that order. Let me touch on that real briefly. I'd like to point out to the Court, and I should have, Mr. Nissen will be addressing in a more fulsome manner the bankruptcy questions, I believe. I don't agree that that is necessary to Judge Fischer's decision. I believe that is dicta. Judge Fischer's decision was that he had no power to act on this stipulation that was in front of him with the trustee, where Mr. Hughes promised to voluntarily make whole his creditors. Because of the statute of limitations in the bankruptcy context, there are the 50 months. And that's the point. Judge Fischer said there can be no distribution to the creditors because actually one of the accidents occurred more than 60 months after the start of the plan. So that accident alone was outside the plan period. One of the accidents wasn't. The earlier one was within. But he said even if it had been decided and disclosed, there could be no distribution. The discharge did not occur until February of 2018. Well, no, but his concern was not the discharge. It was the 60-month plan period. And he went through quite an analysis as to why there can be no distribution after the 60th month. And I guess I'm having trouble with it. When you have an accident that's after the 60th month, how does that? There were two options still left to the trustee had he been informed properly before the discharge was granted. One of those options would be to move to dismiss the case in its entirety. Perhaps he could have moved to convert it to a Chapter 7 and taken control of the assets that way. I think the thing we cannot lose sight of here, though, is back to the estoppel part of it, which I think has to be decided. And that is, how can this possibly be found to be different than Jones or Van Horn, the situations there? And this Court has found in a number of settings, a number of different cases, that for the inadvertence argument, what we look at is no knowledge of the claims or no motive to conceal. Motive to conceal is not the same as chicanery. It is knowledge that you may have a valuable claim. And such as in the EEOC context, you get the right to sue letter. That is proof positive you knew you have a claim. But also in that context, these are valuable claims. Now we're left with these RRB, Railroad Retirement Board, forms. How did they get in the record? We put them in the record, Your Honor. We put them in the record after Mr. Hughes submitted an affidavit saying he had no knowledge. They clearly show he had knowledge. And those forms are declarations under oath, and they're given to a Federal agency. They are not Railroad Wisconsin Central forms. They are to get sickness benefits under the Railroad Retirement Act. Supposedly, you don't discover the injury. So it's a black lung type of case or something like that. So five years later, you get some sort of cancer. Would that be a different case than one in which you've actually gotten forms saying that you potentially have an injury and a claim? No. It goes to his knowledge. It goes, here we have proof that he had knowledge of these claims. Right. And I'm asking, does it extend to something where you discover an injury five years or more than five years later? Those are different facts, though, that I'm not sure how it would work out, and they say, I'm going to pursue that claim or a lawsuit against the railroad I work for. Now he has submitted an affidavit saying, oh, I didn't understand that. So we have a double problem here. Now we have a record where this gentleman has certified for the Railroad Retirement Board. I'm going to pursue a claim. What's the purpose of that? That's so they can get their money back out of the railroad when the railroad pays the results of that claim. Thank you very much, Mr. Nissen. Good morning, Your Honors. My name is Todd Nissen. I represent Portico. May it please the Court and the Counsel. The U.S. District Court for Minnesota correctly ruled that Mr. Hughes does not have standing to pursue the subject personal injury claims. The personal injury claims arose during the pendency of his bankruptcy, and thus they automatically became property of the bankruptcy estate. A debtor cannot litigate claims that are part of the bankruptcy estate for his own personal interests. However, a debtor may litigate claims as long as it's on behalf of the estate. In this situation, Mr. Hughes did the former and not the latter, as shown by three factors. That's one of the reasons I asked about the effect of the bankruptcy court order, and it may not be challenging or not, but Judge Fisher said that the claims vested in the debtor. Well, Your Honor, maybe I can address the vesting argument quickly here. So it's true that the bankruptcy judge did reference vesting in his order. However, that is at best dicta. The bankruptcy court was asked to decide whether or not to approve a settlement agreement between Mr. Hughes and the debtor, deciding whether the personal injury claims vested in Mr. Hughes was not briefed and was not necessary when ruling on the proposed settlement. So you're saying even putting aside any law, the case argument, you're saying he's wrong. It doesn't vest in the debtor upon discharge? Well, a different issue than standing. So vesting does not equal standing, and vesting does not equal ownership. Vesting is more like possession. Property frequently becomes property of a bankruptcy estate even after vesting in a debtor, such as a paycheck or a cousin. I think that's just wrong. If it's a vest back in the debtor, it's his property. I think that's just flat-out wrong. Two things, Your Honor. Number one is, is that under 11 U.S.C. 1306A1, the property is part of the estate. And the property never transfers out of the state for three reasons. Number one is, and the most important, Mr. Hughes did not schedule it. If Mr. Hughes would have scheduled this property and given the bankruptcy judge, trustee, and creditors an opportunity to analyze and administer it, then it's possible that could have been the result. We don't know, because they were never given that opportunity. Secondly, the trustee did not abandon the property to Mr. Hughes, because the trustee cannot decide to abandon something he doesn't know about. And the trustee, when he did find out about these claims, didn't brush them aside, didn't take actions to abandon them. To the contrary, he took actions to try to get back in front of the bankruptcy judge and get this agreement with Mr. Hughes affirmed. That didn't work. It was denied. And it was too late, right? I mean, at that point it was too late. That's the reason why it had been beyond the five years that the district court lacked jurisdiction, or excuse me, the bankruptcy court lacked jurisdiction. Yes, Your Honor. So basically what happened, the claims timed out. They remain bankruptcy estate property, and they timed out, just like a statute of limitations or a statute of repose or other times where claims expire. And that's what happened. But that doesn't mean that a debtor, I mean, think of the public policy. The law cannot be that a debtor can go have claims or assets that are part of a bankruptcy estate, not disclose them, and then once the five years, 16-month period runs, wait and make claims and take those claims free and clear for their personal benefit to do with whatever they want. And the reason is, is because that would encourage debtors not to disclose their assets. It would encourage them to violate the bankruptcy code requirements in that law, and would it also incentivize future debtors to also either, to not disclose their assets for whatever reason. So the law cannot be that this would be permitted because of, we don't want to reward bad acts, and we don't want to incentivize other people to, I'm running out of time here, not to divulge their claims. Thank you. Mr. Tank-Johnson, when you're ready. Good morning, Your Honors. May it please the Court, Counsel? I'm Ray Tank-Johnson. I represent FLE Racine Railroad Products, Incorporated. Mr. Hughes' filing for bankruptcy results in his lack of standing to pursue personal injury claims in this case, and his failure to disclose his injury claims with the bankruptcy court results in the claims being barred by judicial estoppel. His attempt to correct the omission in the bankruptcy court was denied by that court as untimely. Mr. Hughes claims the district court erred because he's an unsophisticated plaintiff and that he didn't knowingly intend harm. However, the district court properly applied the law that malicious intent is not required here. In Eastman v. Union Pacific, the court held that where a debtor has knowledge of claims and a motive to conceal, courts infer deliberate manipulation. Now, motive to conceal does not mean an active intent to conceal, and I don't think that the court has a way to discover that. And that is why the district court judge here said there's no evidence of intent. But don't district courts and juries find facts that people would argue you have no way of knowing because you can't crawl inside someone's head? I mean, the bottom line is those decisions are made every single day in every single criminal case that requires specific intent. They're made every single day in civil claims in which intent is an element of proof. I mean, people can draw reasonable inferences from all the facts and circumstances and the testimony given and they can decide what's the final fact. It's to decide what's reasonable and what's not reasonable, right? Yes, Your Honor. It seems to me that motive to conceal is actually talking about motive, which is in some way tied to intent, even if only obliquely. Why am I wrong? I think you're right that it is obliquely tied to intent, but it is not the same thing. Intent, as you say, juries decide that all the time. We're here in a different context because we're on summary judgment and we need to know whether or not the laws regarding judicial estoppel will apply. Intent is not required under that. Is that a preconditional fact-finding that needs to be made under Rule 104? Not at all. It's not even mentioned in the standards under Eastman. It's not part of the law required. There is reference to the fact that malicious intent is not required. Court specifically held that. I want you to finish. No, please finish. Okay. Unless you have more to say. Well, I was going to say about intent being tied to motive, Your Honor. I think if, as an example, if someone were to attack my dog, I might have a motive to seek revenge on that person. But I don't really have the intent to act and attack that person until I actually attack the person. I understand. There is a motive for revenge. There is a motive here for Mr. Hughes to conceal his assets. All bankrupt debtors have that motive. Most don't act on it. And we have laws to prevent them from doing so, and we need to have this law of judicial estoppel to prevent bad actors from doing that. I understand, Your Honor. Okay. So I wanted to ask about the vesting point and what your response to that is. I'm not as convinced that the district court actually found that it vested. But I want to know what your opinion is, and I'll have a conversation with opposing counsel about that. Right. So on the vesting — Give me the bankruptcy court. Go ahead. Sure. Yeah. You meant the bankruptcy court, whether it was actually — again, I think that piece is dicta. It's not required for the decision. And I don't think that the bankruptcy court actually was in a position to hold that. It wasn't briefed. And I think it was a piece of the decision that the court really was not in a position to make the best judgment on. In this situation, when the trustee has no knowledge of the assets until it's too late, that is a situation where they never had access to it, and the debtor didn't either. And I see my time is up, but I think I've finished that question. Anything follow-up, Al? Thank you very much. Okay. Thank you, Your Honor. Mr. Gonsberg. Thank you. You don't have a ton of time, so I just want to — I was going to give him two minutes, but whatever. That's good. Two minutes. Oh, thank you. Go ahead. I just wanted to — I know Your Honor has a question for me. Yeah. I just wanted to respond briefly to what counsel said during their argument. I think that every case that has been cited by the defense in support of the application of judicial estoppel has been — is distinguishable from the facts of this case. There are no other cases out there that are similar to this case that I'm aware of. And Mr. Gelhar referenced the Jones case and the Van Horn cases. In both of those cases, there were EEOC claims that were either — had been filed either prior to the bankruptcy proceedings or during the bankruptcy proceedings or that there was a right-to-sue letter. And so that placed the plaintiff or the debtor on notice of claims. The same with — in both of those cases. The Eastman case is clearly distinguishable from this case. In that case, it was a FILA case, but in that case, the debtor, not only did he have a lawsuit pending at the time that the bankruptcy had been commenced, he got up at a creditors' meeting and was specifically asked whether he has any lawsuits pending, and he denied it. He flat-out lied, and from that — from those facts, the Eastman court inferred that there was intent, a deliberate manipulation. Those facts — those are not the facts in this case at all. Let me — I want to ask about the vesting thing. Sure. You have a heading, Lawsuit Vested in the Debtors Upon Discharge. Okay? So it appears — I think it's a poorly drafted heading, but it appears that the district court makes the finding you suggest. But when you actually read the text under it, it says, Since the five-year limitation itself requires denial of the motion, it does not matter if the asset never vested in the debtors, because the trustee cannot distribute anything after five years. And so I think that what the district court is doing is they put it — or the bankruptcy court put a heading in there saying, I'm going to deal with this argument, and then said — made no finding whatsoever and says, It doesn't matter anyways, because I can't do anything after five years. I'm just reading the plain language here. And I want to give you a chance to respond, because the only thing that supports your interpretation is the heading. No, I understand that. I mean, the court does cite a case, you know, in support of its position. But I think that the heading is very clear. I mean, the bankruptcy court was aware of the issues that were pending in the district court, and the bankruptcy court, you know, basically — I mean, it was clear as day that the lawsuit vests in the debtor upon discharge. I'm not sure I agree with you, but what do you make — sorry for going over here, but it does not matter if it ever vested. That is clear language of dicta. The bankruptcy court itself is saying, I understand, no matter what I decide here, it doesn't matter for this case. Well, you're right. It didn't matter with regard to the issue that the bankruptcy court was ruling on, which was whether to, you know, allow the settlement agreement between the plaintiff and the trustee or not. I agree with that. But I think that the bankruptcy court went into a pretty lengthy discussion as to the issues in the case and why there had been no harm to any of the creditors as a result of any nondisclosure, and then went further to say that, you know, the claim vested in — and the court cited Section 1327B of the bankruptcy code in support of its position. And nobody appealed that order. It was not an order that was appealed. Any further? No, I'm good. The matter's been well briefed and well argued, and the court will take it under advisement and issue an opinion in due course. Does that exhaust the argument calendar? Yes, Your Honor. The court will stand in recess until further call of the calendar.